IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

TERRY A. C.,[1]

    Plaintiff,

    v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

Civil Action 2:21-cv-5535
Magistrate Judge Chelsey M. Vascura

## OPINION AND ORDER

Plaintiff, Terry A. C. ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income benefits ("SSI"). This matter is before the Court on Plaintiff's Statement of Errors (ECF No. 12), the Commissioner's Memorandum in Opposition (ECF No. 14), Plaintiff's Reply (ECF No. 16), and the administrative record (ECF No. 9). For the reasons that follow, Commissioner's non-disability determination is **AFFIRMED** and Plaintiff's Statement of Errors is **OVERRULED**.

**I.    BACKGROUND**

Plaintiff protectively filed her DBI and SSI application in August 2018 alleging that she had been disabled since October 19, 2016. (R. 216–17.) Plaintiff's applications were denied initially (R. 71, 72), and on reconsideration (R. 111, 112). On September 22, 2020, a telephonic

---

[1] Pursuant to this Court's General Order 22-01, any opinion, order, judgment, or other disposition in Social Security cases shall refer to plaintiffs by their first names and last initials.

hearing was held before an Administrative Law Judge ("ALJ") (R. 35–66) who subsequently issued a non-disability determination on November 5, 2020 (R. 12–34). That unfavorable determination became final when the Appeals Council denied Plaintiff's request for review on September 21, 2021. (R. 1–6.)

Plaintiff seeks judicial review of that final determination and alleges that remand is warranted because the ALJ erred when analyzing opinion evidence. Specifically, Plaintiff alleges that the ALJ erred when evaluating medical opinion evidence from Lyndsey Nadolson, RN-BHP (aka Lyndsey Nadolson, RN-Behavioral Health Provider). (Pl.'s Statement of Errors 8–13, ECF No. 12.) Plaintiff's allegation lacks merit.

## II. THE ALJ'S DECISION

On November 5, 2020, the ALJ issued the unfavorable determination. (R. 12–34.) At step

one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 19, 2016, the alleged date of onset. (R. 17.) At step two, the ALJ found that Plaintiff had the following severe impairments: mild osteoarthritis of the bilateral knees; NSTEMI, with a history of coronary artery disease; obesity; a major depressive disorder; anxiety disorder; and migraine headaches. (*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 18.)

Before proceeding to step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC")[3] as follows:

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §§ 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

    1. Is the claimant engaged in substantial gainful activity?

    2. Does the claimant suffer from one or more severe impairments?

    3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

    4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

    5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

[3] A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1).

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can occasionally climb ramps and stairs, but can never work at unprotected heights, or dangerous machinery. The claimant can perform simple short cycle tasks in a setting that does not require fast production rate pace, no strict production quotas. The claimant can adapt to a work environment with routine job duties with major changes explained in advance, and gradually implemented.

(R. 21.)

At step four, the ALJ relied on testimony from a Vocational Expert ("VE") to find that Plaintiff was able to perform her past relevant work as a housekeeper. (R. 27.) The ALJ also relied on the VE's testimony at step five to alternatively find that given her age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Plaintiff could perform. (R. 28–29.) The ALJ, therefore, concluded that Plaintiff was not disabled from October 19, 2016, through the date of the ALJ's determination. (R. 29.)

### III.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "take into account whatever in the record fairly detracts from [the] weight" of the

4

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## IV.    ANALYSIS

As previously explained, Plaintiff alleges that the ALJ erred when analyzing opinion evidence. (Pl.'s Statement of Errors 8–13, ECF No. 12.) Specifically, Plaintiff challenges the ALJ's consideration and evaluation of statements endorsed on a checkbox form completed by Lyndsey Nadolson, RN-BHP, on November 8, 2018. (R. 704–06.) The Court finds that this challenge is without merit.

**A.    The statements endorsed by Nurse Nadolson in the form are not medical opinions.**

As a preliminary matter, the Court finds that the statements at issue are not medical opinions. An ALJ's RFC determination must be "based on all the relevant evidence" in a claimant's case record. §§ 404.1545(a)(1); 416.945(a)(1). The governing regulations[4] describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative

---

[4] Plaintiff's applications were filed in August 2018. (R. 216–17.) Accordingly, her claim is governed by regulations applicable to applications filed prior to March 27, 2017.

medical findings. 20 C.F.R. §§ 404.1513(a)(1)-(5); 416.913(a)(1)-(5). The regulations further define these five categories, two of which are relevant here.

First, a medical opinion is defined as "a statement from a *medical source* about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in several enumerated areas. §§ 404.1513(a)(2); 416.913(a)(2) (emphasis added). The regulations further provide that acceptable medical sources ("AMSs") include, among other things, a medical source who is a "Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . . " 20 C.F.R. §§ 404.1502(a)(7); 416.902(a)(7).

Although Licensed Advanced Practice Registered Nurses ("APRNs") are deemed AMSs under the applicable regulations, it does not appear that Nurse Nadolson is an APRN. In Ohio, an APRN is an individual who holds one of the following licenses: 1) a certified registered nurse anesthetist; 2) a clinical nurse specialist; 3) a certified nurse-midwife; or 4) a certified nurse practitioner. Ohio Rev. Code § 4723.01(O). But Ohio law does not provide that a RN-BHP is an APRN. Indeed, the Court cannot find that such a license even exists under Ohio's law. It therefore appears that Ms. Nadolson was simply an RN. An RN is not an AMS. *See* Revisions to the Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844–01, 2017 WL 168819, *5846–47.[5]

---

[5] "Comment: We received many other public comments on the criteria we should use to add AMSs . . . . Most of these commenters . . . suggested we also add a wide variety of other medical sources and nonmedical sources, including . . . registered nurses (RN) . . . .

Response: We value these comments, and we will continue to monitor licensure requirements for the medical sources the commenters suggested that we add. At this time, however, we have decided to add only APRNs, audiologists, and PAs as AMSs. Upon investigation of licensing requirements for other medical sources, we did not find a similar level of consistency or rigor in terms of education, training, certification, and scope of practice.
. . .

Because she was not an AMS, the statements that Nurse Nadolson endorsed on the checkbox are not medical opinions. Instead, the statements endorsed by Nurse Nadolson appear to constitute "evidence from a nonmedical source" which is defined as "any information or statement(s) from a nonmedical source (including you) about any issue in your claim." §§ 404.1513(a)(4); 416.913(a)(4).

This distinction makes a difference. When evaluating the persuasiveness of medical opinions, an ALJ must consider the following factors: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the claimant"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability program's policies and evidentiary requirements." §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5). Although there are five factors, supportability and consistency are the most important, and an ALJ must explain how she considered them when she evaluated a medical opinion. §§ 404.1520c(b)(2); 416.920c(b)(2). Conversely, even though an ALJ must consider all the evidence in a claimant's file, an ALJ is "not required to articulate how [she] considered evidence from nonmedical sources" using these five factors. 20 C.F.R. §§ 404.1520c(d); 416.920c(d).

Here, the ALJ clearly considered Nurse Nadolson's statements. Although the regulations did not require her to do so, the ALJ explicitly discussed her evaluation of them. (R. 26.) Because the ALJ was only required to consider Nurse Nadolson's statements, and the ALJ's determination demonstrates that she did so, the Court does not find that the ALJ erred.

---

For RNs, licensure typically can be obtained with education at or below the bachelor's degree level . . . This is contrast to the current and new AMSs, for whom more rigorous education, training, and credentialing requirements are necessary."

**B.     Even if the statements in the form constitute opinions, the ALJ did not err.**

Moreover, even if the statements endorsed by Nurse Nadolson in the checkbox form are medical opinions (though they are not), the Court finds that the ALJ did not commit reversible error. The ALJ first summarized the information in the checkbox form. The ALJ wrote:

> The record includes an opinion from Lyndsey Nadolson, RN, who indicated that the clamant had significant mental health limitations, including a marked inability to handle conflicts with others, understand and respond to social cues, respond to requests, suggestions, criticism, correction and challenges; marked limitation interacting with others; marked problems in dealing with multiple activities; and an extreme limitation in working a full day without additional breaks (Ex .5F).

(R. 26.) The ALJ then determined that the form completed by Nurse Nadolson was not persuasive and explained how she arrived at that determination. She wrote:

> This opinion is not persuasive. I have not been able to identify any evidence in the record of the claimant having treatment with "Lyndsey Nadolson BHP". The record does contain some reference to the claimant speaking to "BHP" at "OhioHealth," but Ms. Nadolson is not identified at this provider (Ex. 3F, 22, 50). Ms. Nadolson also only supports her opinion with a vague and perfunctory citation to "Documented mental health impairments" (Ex. 5F, 3). However, while the claimant was described in notes from "OhioHealth" as withdrawn, and with a depressed mood at some examinations, at other examinations her psychiatric examinations were normal (Ex. 3F, 11, 25 compared with 3F, 39, 53, 64). Ms. Nadolson's extreme limitations are not support by this limited evidence. Additionally, her opinion is inconsistent with the opinion of the consultative examiner, and with the claimant's normal mental status examinations in the later record (Ex. 8F, 11; 17F, 2-3; 18F, 11).

(R. 26.) As this discussion illustrates, the ALJ found that Nurse Nicholson's were not persuasive for a number of reasons.

**1.     The treating relationship was unclear.**

First, the ALJ indicated that the form completed by Nurse Nadolson on November 8, 2018, was not persuasive because it was not clear if Nurse Nadolson had treated Plaintiff. That observation enjoys substantial record support.

8

The record reflects that Plaintiff sought to establish a treating relationship with providers at OhioHealth Primary Care Physicians ("OhioHealth PCP") on November 28, 2017. (R. 356.) On that date, Amanda Maynard, D.O., noted that Plaintiff was experiencing a moderate episode of major recurrent depressive disorder and anxiety, and that both of those conditions were not controlled. (R. 356.) Dr. Maynard discontinued Plaintiff's Prozac, started Plaintiff on Zoloft, and referred Plaintiff "to BHP for counseling." (R. 356, 361.) At Plaintiff's next appointment on January 22, 2018, Dr. Maynard noted that although she had referred Plaintiff "to BHP for evaluation" and that the "BHP" had twice contacted Plaintiff by phone, Plaintiff had not been feeling well or able to talk. (R. 377.) And although Dr. Maynard wrote on May 11, 2018, that Plaintiff had "been following with BHP" and that Plaintiff would "see them" that day (R. 405), nothing in in the records from OhioHealth PCP indicate that Plaintiff actually treated with any behavioral health provider, including Nurse Nadolson, after Dr. Maynard made the referral but before Nurse Nadolson filled out the checkbox form (R. 385–96, 399–412, 413–21, 422–32).

Likewise, none of the records reflecting treatment that Plaintiff received from other providers during this period indicate that she received treatment from any behavioral health provider, including Nurse Nadolson. (R. 651–74, 1139–49, 675–703, 908–923.) Nor does the record contains any treatment notes from Nurse Nadolson after she filled out the checkbox form. Instead, it appears that Plaintiff treated with a different mental health treatment provider after Nurse Nadolson filled out the checkbox form—Southside Mental Health ("SSMH")—and even then, it appears that after being evaluated there on January 15, 2019 (R. 1254–70, 1272–83), Plaintiff did not meet again with anyone from SSMH until she asked to be discharged from their care on November 27, 2019 (R. 1287).

9

Plaintiff asserts that the ALJ erred by noting that it was unclear if Nurse Nadolson treated her instead of re-contacting Nurse Nadolson for clarification. (Pl.'s Statement of Errors 10, ECF No. 12.) But the current regulations provide that an ALJ "*may* recontact your medical source" when medical evidence is inconclusive or insufficient. 20 C.F.R. § 404.1520b(b)(2)(i), 416.920b(b)(2)(i) (effective March 27, 2017) (emphasis added). Courts have concluded that the "duty to recontact is now permissive, rather than mandatory." *Worth v. Comm'r of Soc. Sec.*, No. 2:20-cv-4620, 2021 WL 3029680, at * 8 (S.D. Ohio July 19, 2012) (quoting *Glover v. Comm'r of Soc. Sec.*, No. 1:16-cv-84, 2016 WL 7638142, at * 8 (N.D. Ohio Dec. 22, 2016), *report and recommendation affirmed*, *Glover v. Colvin*, 1:16-cv-84 2017 WL 36267 (N.D. Ohio January 4, 2017)).

    **2.**    **The ALJ's supportability and consistency assessments are supported by substantial evidence.**

In any event, the ALJ also found that the statements endorsed by Nurse Nadolson in the checkbox form lacked supportability and consistency. And those determinations are both supported by substantial evidence.

The governing regulations explain the "supportability" and "consistency" factors as follows:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. §§ 404.1520c(c)(1)–(2); 416.920c(1)–(2). In practice, this means that the supportability factor "concerns an opinion's reference to diagnostic techniques, data collection

procedures/analysis, and other objective medical evidence." *Reusel v. Comm'r of Soc. Sec.,* No. 5:20-CV-1291, 2021 WL 1697919, at *7 n.6 (N.D. Ohio Apr. 29, 2021). And the consistency factor relates to an opinion's congruence with evidence from other sources, including other medical sources. § 404.1520c(c)(2).

### a. The ALJ did not err in her supportability assessment.

Here, the ALJ determined that supportability was lacking because Nurse Nadolson only made vague and perfunctory references to "Documented mental health impairments" in support of the statements that she endorsed in the checkbox form. (R. 26.) The record substantially supports that determination—Nurse Nadolson did not refer to any objective evidence, such as examination findings or diagnostic tools, when completing the checkbox form. (R. 704–06.)

For instance, Nurse Nadolson checked boxes on the form indicating that Plaintiff had marked limitations in the ability to work at an appropriate and consistent pace, or complete tasks in a consistent manner. (R. 705.) In a section asking her to "[d]escribe the medical/clinical findings that support[ed] [that] assessment" Nurse Nadolson wrote: "Multiple Physical & Mental Health Impairments – Require extra time (Breaks) Related to pain, mental distress." (*Id.*) But Nurse Nadolson did not refer to any objective evidence substantiating that Plaintiff required extra time or breaks to complete tasks. (*Id.*) Likewise, Nurse Nadolson checked boxes indicating that Plaintiff had marked limitations in the ability to manage psychologically based symptoms; make plans independently of others; and handle conflicts with others. (R. 705–06.) In sections asking her to "[d]escribe the medical/clinical findings that support[ed] [those] assessment[s]" Nurse Nadolson wrote: "Mental Health Impairments" and "Documented Mental Health Impairments." (*Id.*) But for an opinion to meet the supportability standard, it must be rooted in documented findings, and in particular, findings documented by the medical provider who offers the opinion at

11

issue. Such is not the case here. Moreover, checkbox forms with little or only minimal explanation, or that merely refer to a diagnosis, like the one in this case, are of only limited value. *See Toll v. Comm'r of Soc. Sec.*, No. 1:16cv705, 2017 WL 1017821 at *4 (W.D. Mich. March 16, 2017) (finding that "even if the ALJ failed to provide good reasons" for assigning little weight to a treating source's opinion, such error was harmless where the opinion consisted of a checkbox worksheet lacking any explanation beyond a diagnosis).

The ALJ also determined that Nurse Nadolson's statements lacked supportability because they were unsupported by findings in medical records from OhioHealth, where Nurse Nadolson worked. The ALJ correctly noted that although examinations at OhioHealth sometimes reflected that Plaintiff was withdrawn and had a depressed mood, other examinations at OhioHealth revealed normal findings. (R. 26.) Substantial evidence supports that determination. Plaintiff's scores on depression screens administered at OhioHealth PCP in 2017 and 2018 showed that she experienced only moderate depression. (R. 362, 377, 405.) In addition, during two examinations conducted by Dr. Maynard in 2017 and 2018, it was noted that Plaintiff was withdrawn and had a depressed mood. (R. 366, 388.) But at those same examinations, Dr. Maynard also found that Plaintiff was oriented to person, place, and time; Plaintiff was well developed and well nourished (R. 365, 379); and that Plaintiff had normal speech, judgment, thought content, cognition, and memory (R. 366, 380). An examination by a CNP at OhioHealth PCP on February 21, 2018, found that Plaintiff was oriented to person, place, and time; well developed and well nourished; and that she was active, cooperative, and in no distress. (R. 394.) The February 21, 2018 examination by the CNP further found that Plaintiff had normal mood, affect, behavior, judgment, and thought content. (*Id.*) On May 11, June 26, and August 8, 2018, Dr. Maynard found that Plaintiff was oriented to person, place, and time. (R. 408, 418, 428.) During those examinations,

Dr. Maynard twice found that Plaintiff had normal mood and affect. (R. 408, 419.) She also twice found that Plaintiff had normal judgment, normal thought content (R. 408, 428) and normal behavior (R. 419, 428). During the August 8, 2018 examination, Dr. Maynard also found that Plaintiff had normal speech, cognition, and memory. (R. 429.) In 2019 and 2020, Dr. Maynard routinely found that Plaintiff had normal mood, affect, behavior, judgment, and thought content. (R. 739, 1216, 1213, 1204, 1249.) On one occasion in 2020, Dr. Maynard found that Plaintiff had a depressed mood, but during that same examination she also had normal attention, perception, speech, behavior, thought content, cognition, and judgment. (R. 1198.) In short, the ALJ correctly indicated that examinations at OhioHealth PCP regularly resulted in normal findings.

Plaintiff complains that the ALJ "relied on her own interpretation of the of the treatment notes by picking and choosing which examinations to give credence to" and asserts that the AJ's "reliance on some examinations over others suggests that the ALJ engaged in prohibited cherry-picking of the record." (Pl.'s Statement of Errors 8–13, ECF No. 10–11.) Specifically, Plaintiff asserts that the ALJ engaged in cherry picking when she acknowledged that some of the records from OhioHealth PCP noted that Plaintiff was withdrawn and had a depressed mood but that other examinations were normal. (*Id*.) But an allegation of "cherry picking" "is seldom successful because crediting it would require a court to reweigh record evidence." *DeLong v. Comm'r of Soc. Sec*. *Admin*., 748 F.3d 723, 726 (6th Cir. 2014); *see also White v. Comm'r of Soc. Sec*., 572 F.3d 272, 284 (6th Cir. 2009) ("[W]e see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence.") Here, the ALJ acknowledged records reflecting that Plaintiff was withdrawn and had a depressed mood at two examinations in 2017 and 2018. (R. 26, 366, 388.) It was the ALJ's job weigh that evidence

against evidence of unremarkable examination findings. The ALJ did so. The Court does not find that the ALJ erred when she engaged in that process as part of her supportability assessment.

### b. The ALJ did not err in her consistency assessment.

The ALJ additionally found that the statements endorsed by Nurse Nadolson in the checkbox form lacked consistency because they were incongruent with the opinion from the state agency consultative examiner. (R. 26.) Substantial evidence supports that determination.

Plaintiff was examined by psychological consultative examiner Susan Rowland ("CE Rowland") on April 17, 2019. (R. 720–34.) Nurse Nadolson and CE Rowland agreed on some issues. For instance, both wrote that Plaintiff would have difficulties with multi-step tasks. (R. 704, 730–31.) And the ALJ incorporated into Plaintiff's RFC a limitation to simple short-cycle tasks. (R. 21.) But Nurse Nadolson indicated that Plaintiff would have marked limitations interacting with others, including, for example, the ability to handle conflict with others. (R. 706.) In contrast, CE Rowland opined that Plaintiff appeared to have the ability to maintain effective social interactions with supervisors, coworkers, and the public. (R. 731.) The ALJ thus accurately noted that the form filled out by Nurse Nadloson was not consistent with CE Rowland's opinion. And Plaintiff does not challenge the ALJ's evaluation of the latter.

The ALJ also determined that Nurse Nadolson's statements lacked consistency because they were incongruent with later examination findings. Substantial evidence supports that determination. Examinations done by providers at OhioHealth Bone and Joint after Nurse Nadolson completed the form found that Plaintiff was oriented to person, place, and time; she was well developed, well nourished, and in no distress; and that Plaintiff had normal mood and affect. (R. 1104, 1096.) Examinations by providers at OhioHealth Neuroscience after the form was completed regularly found that Plaintiff was in no distress; she was alert and cooperative; her

attention and concentration were adequate; she was oriented x 3; her recent and remote memory was preserved; and that her general fund of information was normal. (R. 902, 892, 878, 864, 854, 841, 1230–31.) Examinations by a cardiologist after the form was completed also routinely found that Plaintiff was in no acute distress; she was alert and oriented x 3; and she had normal mood and affect. (R. 817–18, 808, 777, 760.) Other examinations after the completion date found that Plaintiff had normal affect and appropriate mood (R. 959); normal behavior, thought content, and judgment (R. 1026); and normal mood and thought content (R. 1059). Accordingly, the ALJ's consistency assessment is supported by the record evidence.

## V. CONCLUSION

In sum, the statements endorsed by Nurse Nadolson do not constitute medical opinions, and thus, the ALJ was only required to consider them. But even if they were medical opinions, the ALJ provided record-based reasons for determining that they were not persuasive, including that it was unclear if Nurse Nadolson treated Plaintiff, and that the statements in the form completed by Nurse Nadolson lacked supportability and consistency. Accordingly, the Court **AFFIRMS** the Commissioner's non-disability determination and **OVERRULES** Plaintiff's Statement of Errors.

**IT IS SO ORDERED.**

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE

15